19280

OLIVER *ET AL.* v. McWHIRTER ET AL.

(100 S. E. 533.)

1. VENDOR AND PURCHASER—KNOWLEDGE OF POSSESSION SUFFICIENT TO PUT VENDEE ON INQUIRY.—Although Civ. Code 1912, sec. 3543, provides that possession under an unrecorded deed shall not operate as notice of such instrument, and requires actual notice of the instrument itself, or of its nature and purport, yet a purchaser of land, possession of which is held under an unrecorded deed, is not entitled to the protection of innocent purchaser, if he had notice of such circumstances as were sufficient to put him on inquiry, which, if pursued with due diligence, would have led to knowledge of the rights of those holding possession under the unrecorded deed.

2. MORTGAGES—PURCHASER AT FORECLOSURE WITH KNOWLEDGE OF RIGHTS OF THIRD PARTY.—Evidence *held* to show that purchaser at mortgage foreclosure sale had actual knowledge of plaintiffs' rights in the property sold.

3. PRINCIPAL AND AGENT—KNOWLEDGE OF BOOKKEEPER OF FIRM OF UNRECORDED DEED KNOWLEDGE OF FIRM.—Knowledge of a bookkeeper of a partnership, taking a mortgage on property, of the existence of unrecorded deeds, is binding on the partnership.

4. VENDOR AND PURCHASER—PAST INDEBTEDNESS INSUFFICIENT CONSIDERATION ON PLEA OF INNOCENT PURCHASER.—Consideration based upon past indebtedness is not sufficient to sustain a plea of innocent purchaser, under Civ. Code 1912, sec. 3542, requiring that conveyances of land be recorded, etc.

5. EVIDENCE—PRESUMPTION IN CIVIL ACTION OF INNOCENCE OF DECEASED. —There is a presumption in a civil action that a deceased person did not subject himself to a criminal prosecution and that he did not violate the law.

6. MORTGAGES—EVIDENCE CHARGING MORTGAGEE WITH NOTICE OF PRIOR UNRECORDED DEED.—In an action to recover real estate, evidence *held* to show that defendant mortgagee had actual notice of unrecorded deeds.

Before MAULDIN, J., Union, Fall term, 1918. Reversed and remanded.

Action by Mrs. N. C. Oliver and others against C. M. McWhirter and others. Judgment for defendants, and plaintiffs appeal.

See, also, 109 S. C.; 358, 96 S. E. 140.

The master's report, referred to in the opinion, was as follows:

The above stated case having been referred to me, I beg leave to submit this as my report therein:

It is apparently agreed that there are only two issues for me to pass upon, namely:

(1) Did J. L. McWhirter have sufficient notice of unrecorded deeds from B. F. Pennington to the executors of Price, and from the executors of Price back to Pennington, to supply the place of the record of such deeds?

(2) Does the purchase by J. L. McWhirter, at the foreclosure sale under the mortgage given by Pennington to Pitchford Company, place McWhirter in a position where he can, even if he had notice of the alleged equities of the children of Pennington, make the claim of one who purchased from another who had no notice.

As to the first: I think it clear, from the testimony, that J. L. McWhirter had some notice that the children of Pennington should have had, or did have, some interest in this land. He evidently had heard something to this general effect. But there is nothing in the testimony that McWhirter had any actual knowledge that the money of those children had really been invested in this property. Nor is there anywhere in the record any evidence to show that McWhirter had any knowledge whatever of the fact that a deed had been made, nor that he knew of the contents of such deed. The statute law of this State expressly provides that "actual notice shall be deemed and held sufficient to supply the place of registration only when such notice is of the instrument itself, or of the nature and purport." Section 3543, vol. I, Code of Laws 1912.

It has been argued before me that the rules of equity must, when there is a conflict, prevail over the rules of law.    I apprehend that this argument is unsound, in so far as it applies to the statute law of the State.    When the rules of the common law and of equity conflict, the former gives way to the latter, but not, I think, when the statute law is concerned.    I find, therefore, as a matter of fact, that J. L. McWhirter had no notice of any unrecorded deed conveying this land out of Pennington, and find, further, that said McWhirter had no notice of the nature and purport of such deed or deeds.

As to the second issue: The evidence fails to satisfy me that Pitchford Company ever had any notice of any defect in B. F. Pennington's title to this property.    Pitchford testifies, positively, that he did not, and there is no testimony in contradiction.    The receipt, which is relied on by plaintiffs, uses the plural, to be sure; but that does not necessarily mean, by any means, that more than one deed was deposited with him.    As one of the attorneys said in the argument, it is a common saying among people (laymen) that "here are my titles," or "my titles are good," meaning only one conveyance.    In face of Pitchford's unequivocal statement that he knew nothing of any unrecorded deed, I do not think it possible to conclude that, from the wording of this receipt, more than one muniment of title was deposited with him.    I find, therefore, that Pitchford Company had no knowledge or notice of either of the unrecorded deeds set up by the plaintiffs herein.

I, therefore, conclude as matter of law: First, that J. L. McWhirter had no knowledge or notice of any rights or equities of the plaintiffs in the said property in question sufficient to defeat the claim of purchase for value without notice; and, second, that the purchase by J. L. McWhirter of said property at the foreclosure sale under the said Pitchford mortgage placed McWhirter in the position of a purchaser from one without notice—his rights being measured

by those of Pitchford Company, who was a creditor without notice of any rights or equities of the plaintiffs in said premises.

The foregoing findings and conclusions render unnecessary consideration of the question of betterments, which was also argued before me. In reaching these conclusions of law and fact, I have not considered the testimony of L. G. Southard, to which plaintiffs objected, and which I myself, on reflection, think incompetent.

I, therefore, recommend that the complaint herein be dismissed, with the costs of the action.

*Messrs. L. L. Rice, S. C. Mann* and *Jno. K. Hamblin,* for appellants. *Messrs. Mann* and *Hamblin* cite: *As to weight given equitable issues when in conflict with legal issues:* Code of Procedure 1912, sec. 482; 90 S. C. 14; 21 S. C. 392. *As to sufficient notice to McWhirter:* 99 S. C. 115; 87 S. C. 357; 34 S. C. 559; 3 How. 333; 11 Wall. 217; 41 S. C. 304; 16 S. C. 587; 95 S. C. 388; 103 S. C. 95; 29 S. C. 147; Code of Laws 1912, vol. I, sec. 3543; 19 S. C. 9; 31 S. C. 322; 28 S. C. 58; 48 S. C. 514; 3 Strob. Eq. 134; 14 S. C. 90-91; 7 Pet. 271; 10 Pete 911; 42 S. C. 43; vol. I, Code 1912, sec. 3460; 2 Rich. Eq. 179; 28 S. C. 233; 1 Strob. Eq. 103; 11 S. C. 519; 27 Cyc. 1508. *As to notice to Pitchford & Company, and as to the estate conveyed by the master at a mortgage foreclosure sale to McWhirter:* 106 S. C. 322; 67 S. C. 389; 48 S. C. 131. *As to estate conveyed by master's deed:* 39 S. C. 131; 22 S. C. 312; 37 S. C. 73; 1 Speer's Eq. 236. *As to betterments:* Code 1912, vol. L, secs. 3526 and 3531; 22 Cyc. 17; 45 S. C. 283; 65 S. E. 414, Ga.; 22 Cyc. 18; 4 DeS. Eq. 114. *As to the meaning of the word "title:"* Words and Phrases, vol. VIII; 56 Am. Rep. 409; 70 S. W. 288; Black's Law Dictionary.

*Messrs. Wallace & Barron* and *J. A. Sawyer,* for respondents, cite: *As to what notice is sufficient to supply the place of registration:* Vol I, Code of Laws of S. C., secs. 3542-

3543; 103 S. C. 101; 104 S. C. 1; Pomeroy's Eq. 28-29; Pom. Eq., vol. II, sec. 595, sec. 597; 103 S. C. 95; Pomeroy's Eq., vol. II, sec. 602; Pomeroy's Eq., vol. II, sec. 599; Code of Procedure, sec. 438; 79 S. C. 573; 2 Pom. Eq. 664; Pomeroy's Equity Jurisprudence, vol. II, p. 109. *As to purchaser at a judicial sale with or without notice in the foreclosure of a mortgage:* Code, vol. I, secs. 3542 and 3543; 99 S. C. 256; 86 S. C. 56; 1st McMullen, 375; 28 S. C. 223; 2 Rich. Eq. 185.

August 6, 1919.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

This is an action to recover possession of a house and lot, and for partition. William Price died in 1886, leaving of force his last will and testament, which was probated in Richland county, containing this provision:

"I will and bequeath to Wm. C. Pennington, Benjamin F. Pennington, Mary E. Anderson and Isabella C. Hair, to each $1,000 worth of real estate in value, during their natural lives, and after their decease to revert to their children."

In 1887 Joseph R. Price, as executor, and Isabella M. Burns, as executrix, of William Price's estate, commenced an action in the Court of Common Pleas for Lexington county, to which B. F. Pennington and his children were made parties defendant, alleging that Wm. Price owned a large tract of land in Lexington county, and that the purpose of said action was to determine whether it was his intention for the legatees to take this specific land under the will, or whether the land should be sold, and the sum of $1,000 invested in land, under the same condition. The special referee in that case made his report, with the following recommendation:

"For the defendant, B. F. Pennington, and his children, a lot of land with the dwelling thereon, in the town of

Jonesville, Union county, in which he has been living for a term of years, has been purchased at a price of $1,000, and the plaintiffs now hold title for the same, and are ready to convey the property for the use of the said B. F. Pennington, in accordance with the terms of the will."

The referee's report was confirmed, and it was ordered: "That plaintiffs, J. R. Price and Isabella M. Burns, do convey to the several defendants above named the several parcels of real estate purchased for them; said conveyances to be settled in accordance with the terms of the trust created by the will of the testator, William Price," deceased.

On the 21st of February, 1887, Charles R. Long executed a deed in the usual form, purporting to convey the house and lot to B. F. Pennington in fee, which was duly recorded. On the 10th of February, 1888, B. F. Pennington executed a deed regular in form in all respects, except there was only one subscribing witness, purporting to convey the fee to Joseph R. Price and Isabella M. Burns, which was not recorded. On the 7th of March, 1888, Joseph R. Price and Isabella M. Burns executed a deed, wherein they recited the fact that they made the deed "in pursuance of the judgment of the Court of Common Pleas in and for the county of Lexington entitled *Joseph R. Price, Executor, and Isabella M. Burns, Executrix, of the Will of Wm. Price, Deceased, v. Wm. C. Pennington and Others,*' purporting to convey the land to B. F. Pennington, to have and to hold all and singular the premises before mentioned unto the said B. F. Pennington, his heirs and assigns, for and during his natural life, and after his decease to revert and go to his lawful children."

This conveyance was not recorded. It will thus be seen that the legal title was in B. F. Pennington, that he had a beneficial interest "for and during his natural life," and that he was trustee for his children, who were equitable remaindermen. B. F. Pennington died in 1915.

The defendants denied the material allegations of the complaint and set up the following defense:

"That J. L. McWhirter, their father, acquired title to the land described in the complaint by conveyance made by the master of this Court, under a decree for the sale thereof, under foreclosure of a mortgage given by B. F. Pennington, which carries the fee simple title. The defendants' said ancestor took all the rights, privileges, immunities, interest, and estate of the mortgagor in said mortgage, and acquired the absolute fee simple title to said land against the plaintiffs and all the world, as purchasers, from one who purchased without notice of plaintiffs' alleged right under the deed set out; and defendants plead the same in bar of this action."

The defendants also set up a claim for betterments in case it should be decided that they were not entitled to the land.

At the close of the testimony, the defendants' attorneys made a motion for the direction of a verdict, which was granted, and the plaintiffs appealed. Whereupon the judgment of the Circuit Court was reversed. 109 S. C. 358, 96 S. E. 140. The following reasons for reversal were assigned by this Court:

"In the first place, the testimony as to notice of the plaintiffs' equitable rights by J. L. McWhirter was conflicting, and subject to more than one reasonable inference; and, in the second place, there was error on the part of his Honor, the presiding Judge, in undertaking to decide the plea of purchaser for valuable consideration without notice, which is equitable in its nature, in connection with the action to recover the possession of the land, which must be tried by a jury, unless a decision of the equitable issues renders unnecessary the trial of the legal issues."

The master, to whom the case was referred, after it was remanded, sustained the said defense, and his report (which will be set out) was confirmed by his Honor, the presiding Judge, for the reasons therein stated by the master, and the plaintiffs again appealed.

36—112

1. The first question that will be considered is whether there was error on the part of his Honor, the Circuit Judge, in sustaining the ruling of the master that the provisions of section 3543 of the Code of Laws of 1912 were conclusive of the rights of the plaintiffs, for the reason that J. L. McWhirter did not have actual notice of the unrecorded deeds themselves, nor of their nature and purport. On the 24th of December, 1888, an act was approved with the following provisions:

"That from and after the passage of this act no possession of real property described in any instrument of writing required by law to be recorded shall operate as notice of such instrument; and actual notice shall be deemed and held sufficient to supply the place of registration only when such notice is of the instrument itself or of its nature and purport."

This act was incorporated in the Code of Laws of 1912 as section 3543. The deed from Long to Pennington was executed on the 21st of February, 1887, and the act was not approved until the 24th of December, 1888. The children, together with their father, B. F. Pennington, immediately entered into possession of the house and lot, and there remained for several years. Therefore section 3543 is not applicable to this case. *Foster v. Bailey*, 82 S. C. 378, 64 S. E. 423. In that case the Court used this language:

"This statute changed the rule declared in *Sheorn v. Robinson*, 22 S. C. 32; *Daniel v. Hester*, 29 S. C. 147, 7 S. E. 65, and like cases, that possession is notice of an unrecorded deed. The cases of *Harman v. Southern Ry.*, 72 S. C. 235, 51 S. E. 689, and *Southern Ry. v. Howell*, 79 S. C. 286, 60 S. E. 677, are not conclusive for appellant, as the possession under an unrecorded deed in each of those cases arose at a time when the rule in *Daniel v. Hester* was in force, and was a continuing possession at the time the subsequent deed was made."

2. But even if section 3543 was applicable to this case, and it appeared from the testimony that J. L. McWhirter had notice of such circumstances as were sufficient to put him on inquiry, which, if pursued with due diligence, would have led to knowledge of the plaintiff's rights, he is not entitled to the protection of a purchaser for value without notice. *Beck v. Railroad,* 99 S. C. 310, 83 S. E. 335.

3. Furthermore, that section is not applicable when the party in possession claims under an equitable title, as in the present case.

"One in possession under an equitable title has nothing that he can record; and possession, open and unconcealed, is the only mode by which he can give notice to the world of his rights; and when this notice is given, in the only way in which it could be given, he should be protected." *Sheorn v. Robinson,* 22 S. C. 32; *Sweatman v. Edmunds,* 28 S. C. 58, 5 S. E. 165; *Folk v. Brooks,* 91 S. C. 7, 74 S. E. 46; *Manigault v. Lofton,* 78 S. C. 499, 59 S. E. 534.

As the children could not assert their rights until the termination of their father's life estate, he could do no act destructive of their estate.

"If, as we have held, Regina Gadsden took only a life estate, with remainder to the plaintiffs as her issue living at the time of her death, nothing that she did in her lifetime could affect the legal rights of the remaindermen, and no order made by the Court in the proceedings for partition, to which these plaintiffs were not parties, although they were then susceptible of being made parties, can be allowed to impair their rights." *Gadsden v. Desportes,* 39 S. C. 131, 17 S. E. 706; *Sullivan v. Latimer,* 35 S. C. 422, 14 S. E. 933; *Folk v. Hughes,* 100 S. C. 220, 84 S. E. 713.

4. We proceed to show that J. L. McWhirter, not only had a sufficient notice to put him on inquiry, but that he had

actual knowledge of the plaintiffs' rights. It appears from the testimony that the executors of William Price's estate, through their attorney, wrote to a party ·in Jonesville, requesting him to send a certificate from three disinterested persons that the Long house and lot would be a good investment for the $1,000 bequeathed to B. F. Pennington and his children by Price, and J. L. McWhirter signed the certificate. J. L. McWhirter made an affidavit that he served a copy of the summons, in the case of the executors of Price against Pennington and his children, on Lilian M. Pennington, Ida M. Pennington, and Carrie S. Pennington, by delivering to them personally a copy thereof, and to B. F. Pennington, their father, *with whom they reside,* and that he knows the persons named to be those spoken of in the summons. J. L. McWhirter purchased a lot adjoining the one in question, and this appears in the description of it: "Bounded by lands of the children of B. F. Pennington."

W. H. Anderson testified: "That he knew J. L. McWhirter; lived on opposite side of railroad from him; knew B. F. Pennington; the relationship .between· Pennington and McWhirter was very close; had a conversation with McWhirter in regard to this property; he remarked to me that he thought so much of Pennington that he was very much surprised that the estate was left like it was, knowing that Pennington had only a lifetime interest in the estate; said he knew, or thought, that Pennington was fully capable of taking care of the property, and it wasn't necessary to secure it that way, by giving him only a life interest in it, and at his death to his children. These conversations were in 1887, at the time I was living in Jonesville."

John Whitlock testified: "Was deputy sheriff eight or nine year; raised near Jonesville; knew J. L. McWhirter very well; we went to school together; was on very intimate terms with him. After Mr. McWhirter had bought this land, I offered him $100 for his bid, provided he could give

me a good title; he just said he couldn't take it. He said
he hadn't got a title in himself. * * * He said he didn't
know whether he could get a good title for himself. He
said he hoped to keep the property long enough to get his
money back out of it."

John Long testified: "Lives about 2½ miles from Jones-
ville; knew J. L. McWhirter. Q. What conversation did
you have with J. L. McWhirter, in regard to this being
entailed property? A. He said he thought that it . was
entailed property. Q. When was that? A. I can't exactly
tell you when. Q. How long ago was it? A. I don't know
exactly. It was since Pennington left there."

J. B. Foster testified: "Have lived at Jonesville 35 years.
* * * The relations between Pennington and McWhirter
were very pleasant, I think. They were closely associated
together, especially on Sundays. The town was small, and
we all went to Sunday school together on Sundays, and
preaching together."

In reply to questions as to the Penningtons investing in
property there, and McWhirter's knowledge of same, the
witness said:

"Just general talk. Mr. McWhirter didn't say anything
about his real knowledge of it, how the money come. As
well as I remember about it, we were just together as men
ordinarily get together, and the Penningtons going to invest
in property somewhere, and Mr. McWhirter says: 'We will
be glad to have you invest here in town.' I said: 'Of course,
we would. We would be glad to have you.' And just in
that way we tried to use our influence to get them to invest
in Jonesville."

To the question, "Where was the money coming from?"
witness said: "They said an uncle, I belive it was, had given
it to them. Q. Were there any conditions or limitations
attached to the way the money was to be invested? A. Mr.
Pennington said repeatedly that he had given it to the chil-
dren. Q. Was there anything said in the conversation

where Mr. McWhirter spoke of them holding it for life? A. They said something about holding it in trust for the children. Q. How often have you heard Mr. McWhirter discuss or talk about that? A. I couldn't say."

J. W. Nance testified: "I am a farmer and deal in stock. I knew J. L. McWhirter in his lifetime, and was on intimate terms with him. He called me 'Old Pard.' I talked with him once about buying the Pennington property, and he advised me not to buy, as I could get no titles to it. This was a year or two before he bought the land. I afterwards saw him at Jonesville, and laughed at him for buying it, after advising me not to do so, because the titles were not good. He never explained to me why I could not get a good title."

Only one reasonable inference can be drawn from the foregoing testimony.

5. We next proceed to show, that the C. W. Pitchford Company not only had actual notice of the unrecorded deeds, but of such facts as were sufficient to put them on inquiry. C. W. Pitchford testified in behalf of the defendants: "Live at Walhalla, a merchant there; am president of the C. W. Pitchford Company. I don't know whether I took the mortgage from Mr. B. F. Pennington to C. W. Pitchford Company or my bookkeeper; that was in 1898; I had it sold. At the time that we took this mortgage Mr. B. F. Pennington was dealing with my company. I traveled; was selling him goods. (Record of mortgage of B. F. Pennington to C. W. Pitchford Company, bearing date the 14th day of April, 1898, and recorded, put in evidence.) Mr. Pennington was residing at Walhalla at the time, where I was doing business. At the time of taking this mortgage, I had parted with something of value, and did thereafter, for this mortgage. I had no notice of any kind of any defect in the title; I thought he had a good title. I had no notice at any time of any unrecorded deed. I turned the paper over to my lawyer to be foreclosed, and I didn't know

anything about the transaction, until I received my money back. I had no notice of any defect in the title or of any unrecorded deed."

On cross-examination: "Recognizes his handwriting, and acknowledges he wrote certificate introduced in evidence: " 'Walhalla, S. C., Oct. 14, 1916. This is to certify that B. F. Pennington has deposited with me his titles on his store-house and lot in Jonesville, S. C., and also his contract with D. B. Free, as collateral for twenty-five dollars, payable on the 31st of Dec., '96. C. W. Pitchford.' "

It will be observed that the witness did not even know whether he or his bookkeeper took the mortgage.. Conced-ing that he himself did not have notice of the unrecorded deed, it by no means follows that his bookkeeper did not have such notice, which, of course, would be binding on the company. The testimony shows that at least a part of the consideration was based upon past indebtedness, which is not sufficient to sustain the plea of innocent purchaser; nor did he explain what the present con-sideration was. How, then, can it be successfully con-tended that the consideration was sufficient to sustain the plea?

The certificate throws far more light upon the question of notice than the testimony of Pitchford. The certificate shows that Pennington deposited with Pitchford his titles, which, as has been shown, consisted of three deeds; and it was necessary to refer to the three, in order to give notice of Pennington's and his children's interest thereunder. The presumption is that more than one deed was deposited; and square dealing and honesty demanded that Pennington should state his and their interests correctly, espe-cially when his children were the equitable remaindermen. If Pennington had induced Pitchford to make the loan, under the belief that he was the owner of the land in fee (as appeared upon the face of the deed executed by Long), he would have subjected himself to a criminal prosecution, for

obtaining money or goods under false pretenses, and at the expense of his own children. The presumption is that he did not intend to violate the law. There is not a particle of testimony that there was a mistake in using the word "titles" instead of "title." · The contents of the deeds were, therefore, notice to Pitchford of the children's rights as equitable remaindermen.

The judgment of the Circuit Court is reversed, and the case remanded for the purpose of determining the question of betterments.

MR. JUSTICE WATTS concurs.

MR. JUSTICE GAGE, *concurring.* In my judgment B. F. Pennington owns the life estate and his children were remaindermen; both held legal estates; B. F. was not trustee for children. I think, therefore, the third postulate of the opinion is not relevant.

The occupancy of B. F. was not notice to McWhirter that the children had a right, and, therefore, the first postulate is not relevant. I agree, though, that B. F. had actual notice of the children's right, and that Pitchford had notice of circumstances which, had he followed up, would have led him to know the interest of the children.

I, therefore, agree to postulates 4 and 5, and vote for reversal.

MR. JUSTICE HYDRICK, *dissenting.* I realize that it would be a hard case to deny the plaintiff relief, and, for that reason, I regret that I feel constrained to dissent. But I am reminded that hard cases make bad precedents.

The mind of the Court evidently has been too much impressed by the fact that McWhirter had notice of plaintiffs' rights when he bought. Otherwise, there is no apparent reason for the elaboration of the evidence to show that he had notice—a fact found by the master and concurred in by the Circuit Judge. But that fact is really irrelevant in the consideration of the question which became the real issue

in the case, as soon as it was established that McWhirter had notice, to wit: Did Pitchford have notice? For it must be conceded that, if he purchased without notice, McWhirter got a good title.

With due respect to my brethren, it seems to me that the inference of notice to Pitchford, which has been drawn from the evidence, is strained and unwarranted, and that the reasoning upon which that inference is based is too technical. I think undue importance has been given to the use of the word "titles" in the certificate which Pitchford signed in 1896, two years before the mortgage was given. It is a matter of common knowledge—and the master and Circuit Judge so find—that laymen frequently use the word "titles" inaccurately to refer to a single deed.

It is said that we must presume that Pennington did the square and correct thing, and delivered to Pitchford all three of the deeds, and especially because, if he did not do that, he laid himself liable to a criminal prosecution for obtaining goods under false pretenses, and we must presume that he was innocent of that crime. Can we fairly indulge that presumption in the face of the undisputed fact in the record evidence that he gave a mortgage of the fee, when he knew that he had only a life estate? And the further fact that he never put on record the deeds by which his estate in fee had been cut down to a life estate? As an honest man, clearly it was his duty to have put those deeds on record.

But must we not also indulge the presumption that Pitchford did not commit perjury when he swore that he did not have notice of the deeds? His character is unimpeached, and this is what he swore: "I had no notice of any kind of any defect in the title. I thought he had a good title. I had no notice at any time of any unrecorded deed."

If the inference drawn by the Court from the use of the word "titles" in the certificate is correct, it follows that he sworse falsely, for, if the three deeds were delivered to him, he must have seen and known that two of them had not been

recorded, and he must have known from the unrecorded deeds that Pennington had only a life estate.

An inference of constructive notice is also drawn from the fact that Pitchford testified that he did not remember whether he or his bookkeeper took the mortgage. Is it reasonable to infer from that statement that the transaction was between Pennington and the bookkeeper, and that the latter may have had notice, which the law would impute to Pitchford? I think not, for the testimony shows too clearly to admit of doubt that the negotiation and agreement was had between Pennington and Pitchford, and what Pitchford meant was merely that he did not remember whether he himself or his bookkeeper performed the clerical work of preparing the mortgage.

I think the clear preponderance of the evidence is in favor of the finding of the master, concurred in by the Circuit Judge, that Pitchford had not had notice. It is often hard to prove a negative; but, if it has not been shown in this case that Pitchford took his mortgage without notice of plaintiffs' rights, I do not see how that defense can be established in any case.

MR. JUSTICE FRASER concurs with MR. JUSTICE HYDRICK.